BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
ALEX J. TRAMONTANO (276666)
tramontano@whafh.com
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN DEGENNARO, Derivatively on Behalf of Nominal Defendant WM TECHNOLOGY, INC., | Case No. _____ |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| DOUGLAS FRANCIS, TONY AQUILA, ANTHONY BAY, BRENDA FREEMAN, OLGA GONZALEZ, SCOTT GORDON, CHRISTOPHER BEALS, ARDEN LEE, SUSAN ECHARD, and MARY HOITT, | |
| Defendants, | |
| and | |
| WM TECHNOLOGY, INC., | |
| Nominal Defendant. | |

Plaintiff Ryan DeGennaro ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant WM Technology, Inc. ("WM" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding WM, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of WM against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between May 25, 2021 and September 24, 2024, inclusive (the "Relevant Period").

2.     WM was founded as a private company in 2008, then-known as WM Holding Company, LLC ("Legacy WM"). On June 16, 2021, Legacy WM merged with a special purpose acquisition company named Silver Spike Acquisition Corp "(Silver Spike").

3.     The Company operates a leading online cannabis marketplace for consumers, known as Weedmaps, as well as a suite of eCommerce and compliance

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

software solutions for cannabis businesses. The Weedmaps marketplace provides cannabis consumers with information regarding cannabis retailers and brands by aggregating data from a variety of sources.

4.    During the Relevant Period, the Individual Defendants made or caused the Company to make materially false and misleading statements to the public concerning one of WM's key operating metrics – the number of "monthly active users" ("MAU") for WM's online marketplace.

5.    For instance, from becoming a public company in June 2021 up to the filing of the Company's quarterly report on Form 10-Q filed on May 6, 2022, WM reported consistent quarterly MAU growth and highlighted this growth trajectory in its SEC filings, which included disclosure of its MAU metric relative to the same quarter in the prior year, often disclosing annual MAU growth of over 50% from the prior year period.

6.    The Company noted the importance of MAU as an indicator of WM's breadth and growth, and of the consumer awareness of WM's brand and consumer use of its website and mobile application. The Company also represented that its "user base and the frequency of consumption of cannabis of that user base is highly valuable to [its] clients and results in clients paying for [its] services."

7.    The truth concerning WM's MAUs first began to emerge on August 9, 2022, when, in a Form 8-K and a quarterly report on Form 10-Q for the quarter ended June 30, 2022 (the "Q2 2022 10-Q"), the Company disclosed that its Board had received an internal complaint regarding "the calculation, definition, and reporting of our MAUs." Specifically, the Q2 2022 10-Q disclosed that the Company had formed a special committee of independent directors to conduct an investigation and summarized the committee's findings as follows:

/ / /

/ / /

As we have previously disclosed, one of the ways in which we acquire users is through paid advertising. To an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users' screens in certain circumstances. Our internal data suggests that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links. Based on management's review, users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively.

8.    The full truth would not emerge until September 25, 2024, when the SEC issued a litigation release (the "SEC Release") announcing it had charged the Company, its former Chief Executive Officer ("CEO") Christopher Beals ("Beals"), and its former Chief Financial Officer ("CFO") Arden Lee ("Lee") for making negligent misrepresentations in WM's public reporting of MAUs. The SEC Release further noted that the SEC had "also instituted a related settled administrative proceeding against WM Technology" and that WM "also agreed to pay a civil penalty of $1,500,000."

9.    According to the SEC's complaint filed against Beals and Lee, although WM's SEC filings stated that it determined its MAU by counting the total number of users that had "engaged with" the WM site in a given period, in truth, a large and increasing percentage of the users of the WM site were instead persons who visited a third-party site, and who were then automatically shown the WM site by way of a "pop-under" advertisement.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.     Following this news, WM's stock price fell by 1.9% to close at $0.92 on September 25, 2024.

11.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, by failing to disclose: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     As a result of the foregoing, a securities fraud class action was filed against the Company and certain of the Individual Defendants, captioned *Ishak v. WM Technology, Inc. et al*, Docket No. 2:24-cv-08959 (C.D. Cal. Oct. 17, 2024) (the "Securities Class Action"). The Securities Class Action has exposed the Company to massive class-wide liability.

14.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

15.     Moreover, in light of the breaches of fiduciary duty engaged in by the

- 4 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of WM's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

17.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.   In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant WM is headquartered in this District, conducts business in this District, and several of the acts and omissions charged herein occurred in substantial part in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# PARTIES

*Plaintiff*

21.    Plaintiff is, and has been at all relevant times, a continuous shareholder of WM.

*Nominal Defendant*

22.    Nominal Defendant WM is incorporated under the laws of Delaware, with its principal executive offices located at 41 Discovery, Irvine, California 92618. WM's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "MAPS."

*Individual Defendants*

23.    Defendant Douglas Francis ("Francis") has served as a member of the Board since June 2021, and as Executive Chair since August 2022. Defendant Francis previously served as Legacy WM's CEO from February 2016 until March 2019 and as Legacy WM's President from January 2009 to February 2016. As set forth in the proxy statement filed by the Company on June 10, 2024 (the "2024 Proxy"), Defendant Francis received $1,162,045 in compensation from the Company in 2023. According to the 2024 Proxy, Francis beneficially owned 4,792,347 shares of the Company's Class A common stock and 22,970,182 shares of the Company's Class V common stock as of May 13, 2024, equating to a combined voting power of 18.4%. Defendant Francis is also named as a defendant in the Securities Class Action.

24.    Defendant Tony Aquila ("Aquila") has served as a member of the Board since June 2021. Defendant Aquila also serves as Chair of the Board's Compensation Committee. As set forth in the 2024 Proxy, Defendant Aquila received $700,661 in compensation from the Company in 2023. According to the 2024 Proxy, Aquila beneficially owned 5,297,761 shares of the Company's Class A common stock as of May 13, 2024, equating to a combined voting power of 3.5%.

- 6 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25.   Defendant Anthony Bay ("Bay") as served as a member of the Board since March 2022. Defendant Bay also serves as a member of the Board's Audit Committee and Compensation Committee. According to the 2024 Proxy, Defendant Bay received $516,614 in compensation from the Company in 2023.

26.   Defendant Brenda Freeman ("Freeman") has served as a member of the Board since June 2021. Defendant Freeman also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Audit Committee. According to the 2024 Proxy, Defendant Freeman received $710,138 in compensation from the Company in 2023.

27.   Defendant Olga Gonzalez ("Gonzalez") has served as a member of the Board since June 2021. Defendant Gonzalez also serves as Chair of the Board's Audit Committee. According to the 2024 Proxy, Defendant Gonzalez received $647,436 in compensation from the Company in 2023.

28.   Defendant Scott Gordon ("Gordon") has served as a member of the Board since June 2021. Defendant Gordon also serves as a member of the Board's Audit Committee and Compensation Committee. According to the 2024 Proxy, Defendant Gordon received $323,328 in compensation from the Company in 2023.

29.   Defendant Beals served as CEO of the Company and Legacy WM from March 2019 until his departure from the company in November 2022. According to the 2024 Proxy, Beals beneficially owned 428,773 shares of the Company's Class A common stock and 6,166,819 shares of the Company's Class V common stock as of May 13, 2024, equating to a combined voting power of 4.4%. Defendant Beals is also named as a defendant in the Securities Class Action.

30.   Defendant Lee served as CFO of the Company and Legacy WM from February 2019 until his resignation from the Company on June 30, 2023. Defendant Lee is also named as a defendant in the Securities Class Action.

31.   Defendant Susan Echard ("Echard") has served as WM's Interim CFO

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

since February 2024. Defendant Echard is also named as a defendant in the Securities Class Action.

32.    Defendant Mary Hoitt ("Hoitt") served as the Company's Interim CFO from July 2023 until approximately February 2024. Defendant Hoitt is also named as a defendant in the Securities Class Action.

33.    Defendants referenced in paragraphs 23 through 32 are herein referred to as the "Individual Defendants."

34.    The Individual Defendants, together with WM, are herein referred to as "Defendants."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.    By reason of their positions as officers and/or directors of WM, and because of their ability to control the business and corporate affairs of WM, the Individual Defendants owed WM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage WM in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of WM and its shareholders so as to benefit all shareholders equally.

36.    Each director and officer of the Company owes to WM and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of WM, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    To discharge their duties, the officers and directors of WM were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

39.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of WM, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.    To discharge their duties, the officers and directors of WM were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of WM were required to, among other things:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to WM's own Code of Conduct and Corporate Governance Guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how WM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of WM and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that WM's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and

- 10 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.    Each of the Individual Defendants further owed to WM and the shareholders the duty of loyalty requiring that each favor WM's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.    At all times relevant hereto, the Individual Defendants were the agents of each other and of WM and were at all times acting within the course and scope of such agency.

44.    Because of their advisory, executive, managerial, and directorial positions with WM, each of the Individual Defendants had access to adverse, non-public information about the Company.

45.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WM.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

46.    In committing the wrongful acts alleged herein, the Individual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

48.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

49.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of WM, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51.    At all times relevant hereto, each of the Individual Defendants was the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

agent of each of the other Individual Defendants and of WM and at all times acted within the course and scope of such agency.

## WM'S CODE OF CONDUCT

52.     WM's Code of Conduct is intended to reflect "the business practices and principles of behavior that support" the Company's commitment to "maintaining the highest standards of business conduct and ethics."

53.     The Code of Conduct states that the Company expects "every employee, officer, and director to not only read and understand the business practices and principles" described in the Code of Conduct, but to also "apply good judgment and the highest personal ethical standards in making business decisions."

54.     In a section titled "Honest and Ethical Conduct," the Code of Conduct states:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The Company's integrity and reputation depends on the honesty, fairness, and integrity brought to the job by each person associated with us. Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

55.     With respect to "Legal Compliance," the Code of Conduct provides:

> Obeying the law is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national, and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer.

Violation of domestic or foreign laws, rules, and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

56.    In a section titled "Financial Integrity," the Code of conduct provides, in relevant part:

The integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate, and transparent. Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor,

the Compliance Officer, the Audit Committee, or one of the other compliance resources described in Section 16.

57.    With respect to compliance with insider trading laws and policies, the Code of Conduct states:

Employees, officers, and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes. All non-public information about the Company or about other companies is considered confidential information. To use material, non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to the Company's Insider Trading Policy for more detailed information.

## WM'S AUDIT COMMITTEE CHARTER

58.    Pursuant to WM's Audit Committee Charter, the purpose of the Audit Committee is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;
- manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, internal audit group (if any) and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements; • oversee the design, implementation, organization and performance of the Company's internal audit function (if any);

- have primary responsibility to help the Board oversee the Company's enterprise risk assessment and management policies, procedures and practices (including, together with assistance from the Technology Committee, those risks related to information security, cybersecurity and data protection)

- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

59.    With respect to the Audit Committee's responsibilities concerning "Financial Review and Disclosure," the Audit Committee Charter provides:

5.  **Annual Audit Results**.  The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the opinion of the Auditors on the annual financial statements;

- the Auditors' assessment of the quality of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);

- all misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

6. **Audited Financial Statement Review; Quarterly and Annual Reports**.    The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

7. **Earnings Announcements**.    The Committee will review and

discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

8. **Proxy Report**. The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

9. **Accounting Principles and Policies**. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

- critical accounting policies and practices;

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as

any management letter or internal-control letter, and monitor management's response to such communications.

10. **Auditor Communications**. At least annually, the Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

11. **Management Cooperation with Audit**.  The Committee will evaluate management's cooperation with the Auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any.

12. **Management and Auditor Analyses**. The Committee will review any analyses prepared by management or the Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

13. **Disagreements Between Auditors and Management**. The Committee will review with management and the Auditors, any disagreements between management and the Auditors, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and management's response, if any, and will resolve any conflicts or disagreements regarding financial reporting.

- 19 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

60.    With respect to the Audit Committee's responsibilities concerning "Internal Controls and Procedures," the Audit Committee Charter provides, in relevant part:

15. **Risk Assessment and Management**.  The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.   The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

16. **Internal Auditors**.   The Company does not currently have an Internal Audit function.  If an internal audit function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the

adequacy and effectiveness of the Company's scope, staffing, and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

17. **Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

\*      \*      \*

18. **Internal Control Report**. At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

## SUBSTANTIVE ALLEGATIONS

***The Individual Defendants' False and Misleading Statements***

61.    On May 25, 2021, the Company filed with the SEC a fourth Amended Registration Statement (the "Registration Statement") on SEC Form S-4.

62.    On May 26, 2021, the Company filed with the SEC its definitive proxy on SEC Form Schedule 14A (the "Proxy") to solicit votes for its June 10, 2021, Special Meeting to approve the planned merger between Legacy WM and Silver Spike.

63.    The Proxy and the Registration Statement each contained the following table displaying the Company's purported MAUs:

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 | 2021 |
| | (dollars in thousands, except for revenue by client) | | | | |
| Paying clients[3] | 4,024 | 4,644 | 3,786 | 4,101 | 4,058 |
| MAUs (in thousands)[4] | 4,684 | 8,009 | 10,000 | 6,457 | 9,163 |

64.    The table included in the Proxy and Registration Statement was materially false and misleading at the time it was made because the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users.

65.    August 13, 2021, WM filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2021. In a section detailing "Key Operating and Financial Metrics," the Company reported that it had 12.3 million MAUs, defining the metric as "as the number of unique users opening our Weedmaps mobile app or accessing our Weedmaps.com website over the course of a calendar month."

66.    On November 12, 2021, WM filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2021. In a section detailing "Key Operating and Financial Metrics," the Company reported that it had 13.9 million MAUs.

67.    On February 25, 2022, WM filed with the SEC its annual report on

Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Beals, Lee, Aquila, Francis, Freeman, Gonzalez, and Gordon. The 2021 10-K included signed certifications from Defendants Beals and Lee pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, to the Company's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

68.    The 2021 10-K reported that the Company had "grown the Weedmaps marketplace to become the premier destination for cannabis consumers to discover and browse information regarding cannabis and cannabis products, **with 15.7 million monthly active users**..."[1]

69.    On May 6, 2022, WM filed its quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2022. In a section detailing "Key Operating and Financial Metrics," the Company reported that it had 13.9 million MAUs.

70.    On August 9, 2022, WM filed the Q2 2022 10-Q with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2022. Attached to the Q2 2022 10-Q were certifications pursuant to SOX signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to the Company's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

71.    The Q2 2022 10-Q reported that the Company had "grown the Weedmaps marketplace to become the premier destination for cannabis consumers to discover and browse information regarding cannabis and cannabis products with *17.4 million monthly active users*..."

72.    On November 8, 2022, WM filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2022 (the "Q3 2022 10-Q").

---

[1] Emphases added unless otherwise indicated.

Attached to the Q3 2022 10-Q were certifications pursuant to SOX signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to the Company's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

73.    The Q3 2022 10-Q reported that the Company's MAUs had "decreased to **11.2 million** in the final month of the quarter ended September 30, 2022 from 17.4 million in the final month of quarter ended June 30, 2022."

74.    The Q3 2022 10-Q further noted: "We are evaluating alternative metrics to provide investors that will shed more clarity on down-funnel marketplace behavior than MAUs historically have, and we have determined not to report MAUs going forward."

75.    The statements detailed above were false and misleading when made, and omitted material facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, by failing to disclose: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting.

76.    On March 16, 2023, WM filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Francis, Lee, Aquila, Bay, Freeman, Gonzalez, and Gordon. Attached to the 2022 10-K were certifications pursuant to SOX signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to the Company's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

77.    The SOX certifications included in the 2022 10-K were false because the Company, in allowing a key financial metric to be manipulated, did not maintain

adequate internal controls over financial reporting.

78.     In a section detailed "Legal Proceedings," the 2022 10-K stated, in relevant part:

As previously reported, in the second quarter of 2022, our board of directors received an internal complaint regarding the calculation, definition and reporting of our monthly active users ("MAUs") metric. In response, the board of directors formed a special committee (the "Special Committee") of independent directors to conduct an internal investigation with the assistance of outside counsel. As a result of the findings of that internal investigation, we provided certain additional information regarding the growth and nature of our previously-reported MAUs in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 filed with the SEC on August 9, 2022. This investigation found no impact on our financial results under GAAP or the reporting or disclosure of any currently disclosed non-GAAP financial metric. As also previously reported, in the third quarter of 2022, we determined not to report MAUs going forward. In August 2022, our board of directors determined to voluntarily report the internal complaint and subsequent internal investigation to the SEC. Since that date, we have received two subpoenas from the SEC's Division of Enforcement requesting additional information and documents. In addition, the SEC has issued subpoenas to several of our current and former employees seeking their testimony. We have been fully cooperating with the SEC's investigation. Such investigations are inherently uncertain and their results cannot be predicted with certainty, but could result in penalties or other sanctions against the company, as well as negative publicity

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    and reputational harm. Regardless of the outcome, such proceedings

2    can have an adverse impact on us because of legal costs, diversion of

3    management resources and other factors.

4

5    79.    On May 9, 2023, WM filed with the SEC its quarterly report on Form

6    10-Q for the fiscal quarter ended June 30, 2023 (the "Q1 2023 10-Q"). Attached to

7    the Q1 2023 10-Q were certifications pursuant to SOX signed by Defendants

8    Francis and Lee attesting to the accuracy of financial reporting, to the Company's

9    implementation of adequate internal controls over financial reporting, and to the

10   disclosure of all fraud.

11   80.    The Q1 2023 10-Q SOX certifications were false because the Company,

12   in allowing a key financial metric to be manipulated, did not maintain adequate

13   internal controls over financial reporting.

14   81.    On August 9, 2023, WM filed with the SEC its quarterly report on Form

15   10-Q for the fiscal quarter ended June 30, 2023 (the "Q2 2023 10-Q"). Attached to

16   the Q2 2023 10-Q were certifications pursuant to SOX signed by Defendants Francis

17   and Hoitt attesting to the accuracy of financial reporting, to the Company's

18   implementation of adequate internal controls over financial reporting, and to the

19   disclosure of all fraud.

20   82.    The Q2 2023 10-Q SOX certifications were false because the Company,

21   in allowing a key financial metric to be manipulated, did not maintain adequate

22   internal controls over financial reporting.

23   83.    On November 8, 2023, WM filed with the SEC its quarterly report on

24   Form 10-Q for the fiscal quarter ended September 30, 2022 (the "Q3 2023 10-Q").

25   The Q3 2023 10-Q contained certifications pursuant to SOX signed by Defendants

26   Francis and Hoitt attesting to the accuracy of financial reporting, to the Company's

27   implementation of adequate internal controls over financial reporting, and to the

28

- 26 -

disclosure of all fraud.

84.     The Q3 2023 10-Q SOX certifications were false because the Company, in allowing a key financial metric to be manipulated, did not maintain adequate internal controls over financial reporting.

85.     On May 24, 2024, WM filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Francis, Echard, Aquila, Bay, Freeman, Gonzalez, and Gordon. Attached to the 2021 10-K were certifications pursuant to SOX signed by Defendants Francis and Echard attesting to the accuracy of financial reporting, to the Company's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

86.     The 2023 10-K SOX certifications were false because the Company, in allowing a key financial metric to be manipulated, did not maintain adequate internal controls over financial reporting.

87.     On August 8, 2024, WM filed with the SEC its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2023 (the "Q2 2024 10-Q"). Attached to the Q2 2024 10-Q were certifications pursuant to SOX signed by Defendants Francis and Hoitt attesting to the accuracy of financial reporting, to the Company's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

88.     The Q2 2024 10-Q SOX certifications were false because the Company, in allowing a key financial metric to be manipulated, did not maintain adequate internal controls over financial reporting.

89.     Each of the statements detailed above were materially false and misleading when made, and omitted material facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts,

by failing to disclose: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### The Truth Emerges

90.     The truth first began to emerge on August 9, 2022, when the Company filed the Q2 2022 10-Q disclosing that the Board had received an internal complaint regarding "the calculation, definition, and reporting of [its] MAUs." The Company further revealed that:

…one of the ways in which we acquire users is through paid advertising. To an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users' screens in certain circumstances. Our internal data suggests that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links. Based on management's review, users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively.

91.     On this news, the price of WM common stock dropped over 25%, from $3.46 a share to $2.59 a share.

92.     On September 24, 2024, the full truth emerged when the SEC issued

its litigation release announcing that it had "charged public company WM Technology, Inc. (Nasdaq: MAPS), its former CEO, Christopher Beals, and its former CFO, Arden Lee, for making negligent misrepresentations in WM Technology's public reporting of a self-described key operating metric, the 'monthly active users,' or 'MAUs,' for WM Technology's online cannabis marketplace."

93.    The Release further noted that the SEC had "also instituted a related settled administrative proceeding against WM Technology" and that "WM Technology also agreed to pay a civil penalty of $1,500,000."

94.    The Release further detailed the allegations in the underlying complaint, providing that:

> The SEC's complaint against Beals and Lee alleges that from May 2021 to May 2022, including during a merger with a special purpose acquisition company through which WM Technology became a public company in June 2021, WM Technology misleadingly reported substantial and continued MAU growth and emphasized the strength and expansion of its user base in its public filings and earnings calls. According to the complaint, although WM Technology's SEC filings stated that it determined its MAU by counting the total number of users that had "engaged with" the WM Technology site in a given period, in truth, a large and increasing percentage of the users of the WM Technology site were instead persons who visited a third-party site, and who were then automatically shown the WM Technology site by way of a "pop-under" advertisement. As alleged by the SEC, these purportedly "active" users did not volitionally seek out the WM Technology site, and, in most instances, did not click on any links or

engage in measurable activity on the WM Technology site. The SEC's complaint further alleges that despite the publicly reported growth in MAU, WM Technology's user engagement metrics were stagnant or declining. The SEC also alleges that Beals and Lee were repeatedly advised of these declining user trends on the WM Technology site and the fact that these non-engaging users were making up an increasingly large percentage of WM Technology's total MAU, but failed to reasonably follow up and negligently continued to sign WM Technology's SEC filings and make public statements that reported MAU numbers that included non-engaging users when discussing the company's purportedly growing user base.

95.    As part of its agreement to settle the SEC's administrative claims, the Company "agreed to the entry of a cease-and-desist order prohibiting further violations of Sections 17(a)(2) and (3) of the Securities Act and Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13a-15(a), and 14a-9 thereunder."

96.    On this news, the price of WM's common stock fell by 1.9% to close at $0.92 on September 25, 2024.

***Harm to the Company***

97.    As a direct and proximate result of the Individual Defendants' misconduct, WM has lost and expended, and will lose and expend, millions of dollars.

98.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers and directors, and amounts paid to outside lawyers, accountants, and investigators in connection thereto. Such losses also include the costs and legal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

fees associated with the SEC's administrative proceedings, as well as the settlement payment of $1.5 million.

99.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

100.    Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

101.    Further, as a direct and proximate result of the Individual Defendants' conduct, WM has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

103.    WM is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

104.    Plaintiff is an owner of WM common stock and has been a continuous shareholder of Company stock at all relevant times.

105.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

106.    A pre-suit demand on the Board of WM is futile and, therefore,

excused. At the time this action was commenced, the seven-member Board consisted of Individual Defendants Francis, Aquila, Bay, Freeman, Gordon and Gonzalez (the "Director Defendants") as well as non-party Glen Ibbott. As set forth below, all six Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

107.    The acts complained of herein constitute violations of fiduciary duties owed by WM's officers and directors, and these acts are incapable of ratification.

108.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

109.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

110.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

111.    Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

112.  Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

113.  Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

114.  Defendants Bay, Freeman, Gonzalez, and Gordon (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

115.  Additionally, Director Defendants Aquila, Francis, Freeman, Gonzalez, and Gordon each signed the 2021 10-K, while all six Director Defendants signed the 2022 10-K and 2023 10-K.

116.  Further, the Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's

standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

117.   Thus, for all of the reasons set forth above, all of WM's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### COUNT I
**Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, and Rule 10b-5**

118.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.   The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

120.   The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.   The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly

- 34 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

situated.

122.   The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of WM were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

123.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts of WM, their control over, and/or receipt and/or modification of WM's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning WM, participated in the fraudulent scheme alleged herein.

124.   As a result of the foregoing, the market price of WM common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of WM common stock in purchasing WM common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

125.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm, as well as the costs associated with responding to, and settling, the SEC's administrative action.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

# COUNT II

## Against the Individual Defendants
## For Breach of Fiduciary Duty

126.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.  The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

128.  The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

129.  The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

130.  Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, by failing to disclose: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting.  As a result, the Individual

Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

131.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

132.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

133.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, costs associated with the SEC administrative action and related settlement, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

134.    Plaintiff, on behalf of WM, has no adequate remedy at law.

### COUNT III
**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted,

conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

137.   Plaintiff, on behalf of WM, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants
### For Unjust Enrichment

138.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, WM.

140.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from WM that were tied to the performance or artificially inflated valuation of WM, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

141.   Plaintiff, as a shareholder and a representative of WM, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

142.   Plaintiff, on behalf of WM, has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants
### For Waste of Corporate Assets

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

143.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.   The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

145.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; (b) incurring costs associated with the SEC administrative action, including the $1.5 million settlement of that action; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

146.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

147.   Plaintiff, on behalf WM, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of WM and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing WM to take all necessary actions to reform and improve its corporate governance and internal procedures to protect WM and its stockholders

from a repeat of the damaging events described herein, including, but not limited to;

        ▪   strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

        ▪   strengthening the Company's internal reporting and financial disclosure controls;

        ▪   developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

        ▪   strengthening the Company's internal operational control functions;

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Date: November 8, 2024        **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

                        By: /s/ Alex J. Tramontano
                        ALEX J. TRAMONTANO
                        BETSY C. MANIFOLD
                        RACHELE R. BYRD
                        750 B Street, Suite 1820
                        San Diego, CA 92101
                        Telephone: 619/239-4599
                        Facsimile: 619/234-4599
                        manifold@whafh.com
                        byrd@whafh.com
                        tramontano@whafh.com

                        **RIGRODSKY LAW, P.A.**
                        HERBERT W. MONDROS

- 40 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1007 North Orange Steet
Suite 453
Wilmington, DE  19801
Telephone: (302) 295-5310
Email: hwm@rl-legal.com

**GRABAR LAW OFFICE**
JOSHUA H. GRABAR
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

- 41 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Ryan DeGennaro, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of WM Technology, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of _____ 2024.

10/30/2024

_____
Ryan DeGennaro